# IN THE UNITED STATES DISTRICT COURT
# FOR THE NORTHERN DISTRICT OF ILLINOIS
# EASTERN DIVISION

| | |
|---|---|
| STANLEY SMITH, ) <br> ) <br> Plaintiff, ) <br> ) <br> v. ) <br> ) <br> UNION PACIFIC RAILROAD, ) <br> ) <br> Defendant. ) | Case No. 11-cv-986 <br><br> Judge Robert M. Dow, Jr. |

## MEMORANDUM OPINION AND ORDER

Plaintiff Stanley Smith ("Plaintiff") brings this action against Defendant Union Pacific Railroad ("Defendant" or "Union Pacific") for violating the Americans with Disabilities Act ("ADA") by allegedly failing to return him to work in a timely manner after he completed medical treatment for alcoholism. This matter is before the Court on Defendant's motion for summary judgment [125]. For the reasons stated below, the Court grants Defendant's motion [125]. This order resolves all remaining claims in the case. Judgment will be entered in favor of Defendant and against Plaintiff.

**I.  Background**

The Court takes the relevant facts primarily from the parties' Local Rule 56.1 statements, [127], [135], and [138], and the exhibits attached thereto. The following facts are undisputed except where otherwise noted. The Court has jurisdiction over Plaintiff's ADA claims pursuant to 28 U.S.C. § 1331. Venue is proper in this Court pursuant to 28 U.S.C. § 1391.

Plaintiff was employed by Defendant at all times relevant to this action. Defendant is an employer within the meaning of the ADA, 42 U.S.C. § 12111(5). Plaintiff was hired by Defendant in June 1998 as a brakeman conductor and held that position for two years.

Thereafter, Plaintiff became a Locomotive Engineer, a position he has held ever since. As a Locomotive Engineer, Plaintiff ran both freight and passenger trains between 2000 to 2005. Since 2010, Plaintiff has been running only passenger trains for approximately 51 hours per week, Sunday through Friday. When running passenger trains, Plaintiff is responsible for seven cars, which transport approximately 1,000 passengers during morning rush hour and 600 passengers during evening rush hour.

As an employee of Defendant, Plaintiff was aware that he was required to be familiar with and comply with Defendant's policies and procedures. Plaintiff also was subject to a Collective Bargaining Agreement ("CBA") between Defendant and the Brotherhood of Locomotive Engineers that covered the terms and conditions of his employment at Defendant.

In 1999, Plaintiff took a leave of absence because he was charged with driving under the influence ("DUI"). At that time, Plaintiff was required to go through Defendant's Employee Assistance Program ("EAP") to receive treatment for both drug and alcohol abuse before he could be reinstated to work. Plaintiff did not experience any difference in the terms and conditions of his employment after he returned to work other than being subject to random drug tests. After he returned to work, Plaintiff did not receive further medical treatment; instead, his treatment plan was "[t]he Father, and the Son, and the Holy Ghost." [127-4] at 19-20 (Plaintiff's deposition testimony).

On April 16, 2005, Plaintiff was pulled from service because of a moving violation, also known as a Form B violation, because he admittedly ran a Metra train past a red flag without giving notification to the men working on the tracks that he was coming through. Thereafter, Plaintiff was suspended pending an investigation, which never occurred because he went out on

an extended leave of absence in September 2005. At the time, Plaintiff was aware that a Form B violation carried discipline of at least a 60-day suspension.

On or about September 22, 2005, Plaintiff reported to Defendant that his driver's license had been revoked for operating a vehicle under the influence of alcohol or a controlled substance. As a result, Plaintiff was once again enrolled in the EAP and required to be evaluated to determine whether he had an active substance abuse disorder. At that time, Lori Scharff was a Manager of the EAP and reported to Dr. Mark Jones.

Plaintiff entered an intensive outpatient treatment program at Rush University Medical Center ("Rush") in October 2005 with John Houlihan treating him. Scharff testified from records that Houlihan reported to her that Plaintiff was "struggling with his program with inconsistent attendance and participation." [127-6] at 6. Plaintiff denies this. Plaintiff testified that he could not recall whether he was still using drugs or alcohol at that time. [127-4] at 35.

Plaintiff thereafter was admitted to Cornerstone of Recovery ("Cornerstone") in Tennessee. After five days in the program, Plaintiff returned home to Chicago, claiming that Cornerstone could not meet his needs. Defendant thereafter arranged for Plaintiff to be transferred to Pine Ridge in San Diego on February 27, 2006. Plaintiff stayed at Pine Ridge until March 27, 2006. Plaintiff then returned to Rush for outpatient treatment, as recommended by Pine Ridge. Scharff testified from records that an unidentified clinician reported to Defendant: "[Plaintiff] is making minimal progress. Continues to have medical concerns. [Plaintiff] attends [Intensive Outpatient Program ('IOP')] infrequently." [127-6] at 8-9. Plaintiff disputes that he was "making minimal progress." [135] at 5.

Plaintiff finished the Rush IOP program in the Spring of 2006. Plaintiff testified at his deposition that Houlihan informed him that he completed the program. See [135-1] at 28.

3

Plaintiff submits a letter from Rush Program Counselor Edward Lynch, dated May 30, 2006, concerning his completion of the program. See [135-2]. Defendant objects to the inclusion of this letter in the record on the basis that it is not authenticated and is inadmissible hearsay. Lynch wrote in relevant part:

> To Whom It May Concern:
>
> Please accept this letter as verification that [Plaintiff] successfully completed Intensive Outpatient Treatment (IOP) for Alcohol Dependence, and Cocaine Abuse, at Rush Behavioral Health Center (RBH), as of 5/26/06.
>
> [Plaintiff] attended a total of 45 IOP sessions, for a total of 157.5 treatment hours. These sessions took place from 10/19/05 through 1/26/06, and from 4/5/06 through 5/26/06. [Plaintiff] was referred for Inpatient Treatment during the period from 1/26/06, until Mr. Smith resumed IOP treatment on 4/5/06.
>
> At discharge from IOP, it was agreed that [Plaintiff] will continue treatment in a Continued Care Group (CCG) at RBH, meeting once weekly, for a period of six months to one year.
> …

[135-2] at 1.

Lynch testified at his deposition that if he had "see[n] something that indicate[d] a level of need higher than" the weekly Continued Care Group, "[he] would have indicated" in his letter. [135-3] at 23. Lynch also testified:

> Q    But as far as both yourself understanding that you're not an individual at UP that says who can work there and who cannot, you made the recommendation that at least from the treatment that you observed [Plaintiff] had the ability as far as you were concerned to return to full work responsibilities without restriction?
>
> A    As far as the treatment was concerned.
>
> Q    Yes, that's correct?
>
> A    Correct.
>
> Q    In other words, with respect to your observations as it relates to his drug and alcohol dependency, you didn't see that as an obstacle for him to return to work without restriction, correct?

A    Correct.

[135-3] at 58.

At Houlihan's recommendation, Plaintiff was scheduled for a fitness for duty examination with Dr. Stafford Henry on June 30, 2006. On August 24, 2006 and continuing on August 29, 2006, Plaintiff met with Dr. Henry for his fitness for duty examination. On September 3, 2006, Dr. Henry provided Defendant with a fourteen-page assessment of Plaintiff, including his recommendations regarding Plaintiff's return to work:

> In looking at the totality of all available data, as dated above, I am of the opinion, to a reasonable degree of medical and psychiatric certainty, there is no evidence to indicate or even suggest that [Plaintiff] has been able to attain a sustained period of abstinence. This is concerning as he is seeking to again resume his position as an engineer, a position which at any point could involve the safety of hundreds of citizens.
>
> I am of the opinion, to a reasonable degree of medical and psychiatric certainty, at the present time, there exists an insufficient clinical basis to opine that [Plaintiff] has been abstinent, is firmly engaged in recovery and therefore appropriate to warrant the public trust.
>
> I am further of the opinion, to a reasonable degree of medical and psychiatric certainty, that if [Plaintiff] is to again be appropriate to resume his position as engineer for the a Railroad Company, he will need to first present with at least one-year documented abstinence from alcohol and all other mood-altering substances. In order for him to achieve this, I am of the opinion, to a reasonable degree of medical and psychiatric certainty, [Plaintiff] will need to enter a halfway or three-quarter house. He would also have to submit urine toxicology screens (which assess for the presence of ethyl glucuronide) at a frequency of at least once per week, for a period of one year. Prior to his return to his position, Mr. Smith would need to have not only adhered to the above recommendations, but also submitted to a repeat fitness for duty evaluation by an assessor selected by Union Pacific Railroad Company.

On September 15, 2006, Dr. Jones told Plaintiff that he could not return to work until these recommendations were completed because he had not adequately established sobriety, had not finished care, and was still in danger of relapse. At his deposition, Dr. Jones testified from

5

notes that Plaintiff's response was "[h]e was 'Angry and feels that he was discriminated against in some way'" and that his response back was "[t]hat it was [Plaintiff's] lack of commitment that got [him] this far." [127-8] at 12. Plaintiff denies this and cites to his affidavit, in which he states that he did not learn until Fall 2010 that his "continued treatment was unnecessary and Union Pacific's refusal to allow me to return to work was improper." [135-5] at 1. Plaintiff also cites to Lynch's May 30, 2006 letter and deposition testimony about Plaintiff's fitness to return to work.

Thereafter, Defendant arranged for Plaintiff to be admitted to Extended Aftercare in Houston for treatment, which lasted approximately one year from January 2007 until January 2008. While at Extended Aftercare, Plaintiff worked nearly full-time as an Account Rep with a collection agency from February 28, 2007 through November 28, 2007. After his return to Chicago, Plaintiff was on house arrest until April 8, 2008 because he had left the state with a pending DUI. Defendant maintains, and Plaintiff denies, that Plaintiff's house arrest delayed his return to work at Union Pacific.

On April 24, 2008, Houlihan reported to Defendant that Plaintiff was safe to return to work and recommended continued aftercare at Holy Family. As a result, a return to work physical was scheduled for Plaintiff for May 12, 2008. On May 29, 2008, the Health and Medical Department required Plaintiff to see Dr. Henry for a follow-up fitness for duty examination.

On June 3, 2008, Plaintiff attended a follow-up fitness for duty examination with Dr. Henry. On July 9, 2008, Dr. Henry provided Defendant with eleven-page assessment of Plaintiff, including his recommendations regarding Plaintiff's return to work:

> Although all clinical evidence would suggest that [Plaintiff] has recently been abstinent, I am of the opinion, to a reasonable degree of medical and psychiatric

certainty, that prior to his return to the workplace, he would need to compile at least a four-to-six-month period of documented abstinence. This should include screening for the presence of ethyl glucuronide. I am further of the opinion, to a reasonable degree of medical and psychiatric certainty, that if [Plaintiff] is allowed to return to return to his position, after having demonstrated this period of documented abstinence, urine toxicology screening should continue for the entire period of his employment.

Mr. Smith would also need to regularly use his C-Pap as untreated symptoms of Obstructive sleep apnea could render him both depressed and drowsy. Other recommendations would include Mr. Smith remaining under the care of a primary care physician for preventable health maintenance.

Defendant maintains that throughout the handling of Plaintiff's EAP, Ms. Scharff and Dr. Jones relied on the reports issued by Dr. Henry in deciding whether to return Plaintiff to work; that Ms. Scharff and Dr. Jones had no reason to doubt the information or the recommendations contained in Dr. Henry's reports; and that Plaintiff never contested any of Dr. Henry's findings with Defendant through his union or otherwise.

According to Plaintiff, he has never been diagnosed with a substance abuse problem. Nor can he recall anyone telling him that he had a substance abuse problem. Plaintiff does not consider himself to be an alcoholic and therefore, does not have a sobriety or anniversary date, but claims that he was sober from the summer of 2006 through 2010. According to Plaintiff, he has never abused alcohol or drugs.

There was never a time in Plaintiff's adult life, including when he was going through treatment, that he was unable to work. According to Plaintiff, there was nothing in his daily life that he was prevented from doing due to his treatment for alcoholism. Plaintiff testified that although he was unable to care for himself "financially" while going through treatment—due to Defendant's refusal to allow him to return to work—he could take care of himself on an everyday basis in terms of getting up, showering, cooking, cleaning, and other self-care activities. [127-4] at 74-75.

7

In July 2008, Plaintiff was informed that he would need a sleep study as a result of his diagnosis of sleep apnea. Upon completion of the six month period recommended by Dr. Henry, Plaintiff was scheduled for a return to work examination on February 12, 2009. After completion of the return to work examination, Plaintiff was conditionally cleared to return to work by the EAP and was referred to the Health and Medical Department for clearance. Plaintiff completed the sleep study in May 2009 and was told at that time that he needed to submit two weeks of data from the use of a CPAP machine. Plaintiff testified that his difficulty in obtaining a CPAP machine "was the last holdup" on his return to work. [127-4] at 60.

On or about October 7, 2009, Plaintiff filed a charge of discrimination with the EEOC, alleging:

> I was hired by [Union Pacific] in or around June 1998. Since 2005, I have been subjected to different terms and conditions of employment than my coworkers, and have not been reinstated back to work.
>
> I believe I have been discriminated against because of my regarded as disability, in violation of Americans with Disabilities Act of 1990, as amended.

[135] at 10. According to Plaintiff, his "regarded as" disability is alcoholism.

Plaintiff testified at his October 7, 2015 deposition that he talked to an attorney in 2010 and "felt that [he] was being discriminated" against because he "was held out too long" from returning to work. [135-1] at 52. Plaintiff could not recall whether anyone else (including any physicians at Rush) had advised him that he had successfully completed treatment for alcoholism years prior. *Id.* Plaintiff also submitted an affidavit, dated April 11, 2011, stating that "[i]t was not until 2010 that I was advised I had successfully completed my treatment for alcoholism years prior" and that "[i]n the fall of 2010, I was advised by a physician at Rush Hospital that my continued treatment was unnecessary and Defendant's refusal to allow me to return to work was improper." [135-5] at 1.

8

Plaintiff eventually was able to obtain a CPAP machine and returned to work in July 2010.

According to Plaintiff, the EEOC responded to his charge on November 18, 2010, concluding: "Based upon its investigation, the EEOC is unable to conclude that the information obtained establishes violations of the statutes. This does not certify that the respondent is in compliance with the statutes. No finding is made as to any other issues that might be construed as having been raised by this charge." [138] at 3. Defendant disputes this on the basis that the notice is not authenticated.

On May 31, 2012, Plaintiff filed an Amended Complaint in this Court alleging that he was discriminated against by Defendant based on a record of impairment (Count I) and being regarded as having an impairment (Count II) in violation of the ADA. In both Count I and Count II of his Amended Complaint, Plaintiff alleges that "Union Pacific refused to allow [Plaintiff] to return to work in 2006 despite [Plaintiff's] ability to perform his job." [135] at 11.

## II. Legal Standard

Summary judgment is proper where "the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). "A party asserting that a fact cannot be or is genuinely disputed must support the assertion by … citing to particular parts of materials in the record" or "showing that the materials cited do not establish the absence or presence of a genuine dispute, or that an adverse party cannot produce admissible evidence to support the fact." Fed. R. Civ. P. 56(c)(1). A genuine issue of material fact exists if "the evidence is such that a reasonable jury could return a verdict for the nonmoving party." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986). The party seeking summary judgment has the burden of establishing the lack of any genuine issue of

material fact. See *Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1986). The Court "must construe all facts and draw all reasonable inferences in the light most favorable to the nonmoving party." *Majors v. Gen. Elec. Co.*, 714 F.3d 527, 532-33 (7th Cir. 2013) (citation omitted).

To avoid summary judgment, the nonmoving party must go beyond the pleadings and "set forth specific facts showing that there is a genuine issue for trial." *Liberty Lobby*, 477 U.S. at 250. Summary judgment is proper if the nonmoving party "fails to make a showing sufficient to establish the existence of an element essential to that party's case, and on which that party will bear the burden of proof at trial." *Ellis v. CCA of Tennessee LLC,* 650 F.3d 640, 646 (7th Cir. 2011) (quoting *Celotex,* 477 U.S. at 322). The non-moving party "must do more than simply show that there is some metaphysical doubt as to the material facts." *Matsushita Elec. Indus. Co., Ltd. v. Zenith Radio Corp.*, 475 U.S. 574, 586 (1986). In other words, the "mere existence of a scintilla of evidence in support of the [non-movant's] position will be insufficient; there must be evidence on which the jury could reasonably find for the [non-movant]." *Liberty Lobby*, 477 U.S. at 252.

### III. Analysis

#### A. Exhaustion of Administrative Remedies

A threshold issue before the Court on Defendant's motion for summary judgment is whether Plaintiff timely filed his charge with the EEOC, which is a prerequisite to filing an ADA claim. In Illinois, in order for a plaintiff to file a suit under the ADA, the plaintiff must file a charge with the EEOC within 300 days of when the alleged discrimination occurred. 42 U.S.C. §§ 2000e-5(e)(1), 12117(a); see also *Conley v. Vill. of Bedford Park*, 215 F.3d 703, 710 (7th Cir. 2000); *Cardenas v. First Midwest Bank*, 114 F. Supp. 3d 585, 592 (N.D. Ill. 2015). This date of injury is when the cause of action accrues—*not* when the plaintiff "'determines that the injury

was unlawful.'" *Sharp v. United Airlines, Inc.*, 236 F.3d 368, 372 (7th Cir. 2001) (quoting *Thelen v. Marc's Big Boy Corp.*, 64 F.3d 264, 267 (7th Cir. 1995)); see also *Anderson v. The Foster Group*, 521 F. Supp. 2d 758, 777 (N.D. Ill. 2007). "The requirement that a plaintiff timely file an administrative charge with the EEOC serves two purposes: it promotes the prompt and less costly resolution of the dispute by settlement or conciliation and ensures timely notice to the employer of the grievance." *Porter v. New Age Servs. Corp.*, 463 F. App'x 582, 584 (7th Cir. 2012) (citing *Teal v. Potter*, 559 F.3d 687, 691 (7th Cir. 2009)).

In this case, Defendant's allegedly discriminatory act was its refusal to return Plaintiff to work after he completed the Rush IOP program in Spring 2006. See [37] at 3-7 (Amended Complaint). Plaintiff filed his EEOC charge in October 2009. Unless Plaintiff's claim accrued sometime later than Spring 2006, or the time for filing the EEOC charge was tolled, then his EEOC charge was filed more than two years too late and his lawsuit is untimely.

Earlier in this action, the Court dismissed Plaintiff's complaint as untimely, concluding that neither the discovery rule nor equitable estoppel applied under the facts alleged by Plaintiff. See [19]. The Seventh Circuit agreed, but concluded that the dismissal should have been without prejudice to allow Plaintiff to file an amended complaint based on a "new chronology" that he advanced in his response to Defendant's motion to dismiss. See *Smith v. Union Pacific R.R.*, 474 Fed. Appx. 478, 480 (7th Cir. 2012). In particular, Plaintiff asserted that "he discovered in 2009 that the company deceived him in 2006 into believing that it would return him to service after he completed an additional treatment program," and "[f]rom 2006 to 2010, the company required him to remain in that program, while concealing medical records from him which showed that additional treatment was not necessary." *Id.* at 481. The Seventh Circuit concluded that,

11

"[t]aking these assertions as true, Smith's contentions under the discovery rule and equitable estoppel are colorable, sufficient to pass the pleading stage." *Id.*

Now that the case has proceeding to summary judgment—"the 'put up or shut up' moment in a lawsuit,'"—Plaintiff must respond to Defendant's "properly-supported motion by identifying specific, admissible evidence showing that there is a genuine dispute of material fact for trial" concerning the application of either the discovery rule or equitable estoppel. *Grant v. Trustees of Indiana Univ.*, 870 F.3d 562, 568 (7th Cir. 2017) (quoting *Harney v. Speedway SuperAmerica LLC*, 526 F.3d 1099, 1104 (7th Cir. 2008)). "'The discovery rule starts the statute of limitations running only when the plaintiff learns that he's been injured, and by whom.'" *Johnson-Morris v. Santander Consumer USA, Inc.*, 194 F. Supp. 3d 757, 764 (N.D. Ill. 2016) (quoting *United States v. Norwood*, 602 F.3d 830, 837 (7th Cir. 2010)). Importantly, it is the date that plaintiff has discovered his injury, *not* the date that he "determines that the injury was unlawful," that matters for purposes of evaluating whether his EEOC charge was timely. *Sharp*, 236 F.3d at 372 (internal quotation marks and citation omitted). Equitable estoppel "'comes into play if the defendant takes active steps to prevent the plaintiff from suing in time.'" *Rosado v. Gonzalez*, 832 F.3d 714, 716 (7th Cir. 2016) (quoting *Shropshear v. Corp. Counsel of Chicago*, 275 F.3d 593, 595 (7th Cir. 2001)). "Such a situation can occur if the defendant … 'prevents a plaintiff from obtaining information that he needs in order to be able to file a complaint that will withstand dismissal.'" *Easterling v. Thurmer*, 880 F.3d 319, 324 (7th Cir. 2018) (quoting *Jay E. Hayden Found. v. First Neighbor Bank, N.A.*, 610 F.3d 382, 385 (7th Cir. 2010)).

The Seventh Circuit's prior opinion in this case outlines the evidence required for the discovery rule or equitable estoppel to save Plaintiff's claim. Plaintiff's proof falls short in multiple ways. First, Plaintiff does not identify any evidence that anyone at Defendant assured

12

him that he would be allowed to "return … to service" after completing the Rush IOP program in Spring 2006. *Smith*, 474 Fed. Appx. at 481. Nor can the Court find any statements in the transcript of Plaintiff's October 7, 2015 deposition that would support such an allegation. See [135-1]. In his earlier affidavit, dated April 11, 2011, Plaintiff stated that he "believed [his] treatment for alcoholism that began in 2006 was necessary and needed before [he] could return to work as an engineer for Union Pacific," and this was why he "continued [his] treatment for nearly four years." [135-5] at 1. But he does not state that anyone at Defendant made any representations to him about when or on what conditions he could return to work. Instead, at the time Plaintiff took a leave of absence and began treatment at the Rush IOP—following his September 2005 DUI arrest—he had already been suspended for four months pending an investigation for running a Metra train past a red flag without notifying men on the track.

Second, even if Defendant had assured Plaintiff that he could return to work after completing the Rush IOP program, Plaintiff knew back in 2006 that he had completed the program, because Houlihan told him so. See [135-1] at 28 (Plaintiff's deposition). Therefore, the undisputed facts in the record show that Plaintiff knew of his injury in 2006 but failed to file a timely EEOC charge within 300 days.

Third, Plaintiff has no proof that Defendant withheld any "medical records from him which showed that additional treatment was not necessary." *Smith*, 474 Fed. Appx. at 481. The only "record" that Plaintiff points to as proof of his ability to return to work without additional treatment—the May 30, 2006 letter from Lynch to "whom it may concern"—does not, in fact, say either that Plaintiff is able to return to work or that he requires no further treatment. [135-2] at 1. Lynch simply verifies that Plaintiff has "successfully completed" Rush's IOP program. And he also states that "[a]t discharge" from the program, "it was agreed that [Plaintiff] will

*continue treatment* in a Continued Care Group (CCG) at RBH, meeting once weekly, for a period of six months to one year." *Id.* (emphasis added); see also [135-3] at 43 (Lynch's deposition testimony that his letter "indicates that the discharge from IOP it was agreed that [Plaintiff] will continue treatment in a continued care group"). Even if the letter did contain an opinion that Plaintiff was ready to return to work, there is no evidence that anyone at Defendant ever received the letter (which is addressed only "To Whom It May Concern") or otherwise became aware of it. Lynch could not recall if he ever provided the letter to Defendant. See [135-3] at 42.

Apart from Lynch's letter—which does not address Plaintiff's fitness to return to work—Plaintiff points to Lynch's deposition testimony to the effect that he thought Plaintiff could return to work after completing the IOP program. Lynch's testimony on this topic is somewhat muddled, see [135-3] at 58, but even if it were clear, there is no evidence that Lynch ever communicated with Defendant about Plaintiff's ability to return to work. Instead, Lynch testified that he could not recall if he ever had any contact with Scharf or Jones concerning Plaintiff. [135-3] at 54.

The undisputed evidence further shows that Dr. Henry provided Defendant with a fourteen-page assessment of Plaintiff's fitness for duty, which concluded that Plaintiff was *not* ready to return to work after completing Rush's IOP program. According to Dr. Henry, Plaintiff should enter a halfway house or three-quarters house, have at least one year of documented abstinence from alcohol and other mood-altering substances, and have a repeated fitness for duty examination before returning to his Locomotive Engineer position, which "at any point could involve the safety of hundreds of citizens." [135] at 5. Plaintiff claims that Dr. Henry has no "objective clinical evidence to support his opinion" because he acknowledges that "all clinical

14

evidence would suggest that [Plaintiff] has *recently* been abstinent." [134] at 5 (emphasis added). But there is no inconsistency between Dr. Henry's recognition of clinical evidence that Plaintiff had "recently" been abstinent for some unspecified length of time, and his opinion that Plaintiff should complete at least a four to six month period of documented abstinence before returning to work as an Locomotive Engineer.

Finally, to the extent that Defendant concealed any records from Plaintiff, Plaintiff cannot show that he relied on Defendant's alleged deception when he failed to file a timely EEOC charge. Plaintiff filed his EEOC charge in the Fall of 2009, yet claims that he did not become aware of the information that allowed him to discover his claim until 2010 when he was informed that he had successfully completed treatment in 2006. Plaintiff fails to address this discrepancy, which the Court also pointed out in its earlier opinion dismissing Plaintiff's original complaint as untimely. See [19] at 7. Plaintiff's deposition testimony indicates that the real reason he concluded in 2010 that he had been discriminated against was because he "talked to an attorney" and "realized [he] felt like [he] was held out too long." ]134] at 6-7.

For these reasons, the Court concludes that, viewing the evidence in the light most favorable to Plaintiff, no reasonable jury could find (1) that Plaintiff was unable to discover his claim in 2006 when Defendant informed him that he could not return to work, or (2) that Defendant took any active steps to prevent Plaintiff from suing in time. Defendant is therefore entitled to summary judgment on Plaintiff's ADA claim.

**B.     Discrimination**

Even if Plaintiff's ADA claim were timely, which it is not, Defendant would be entitled to summary judgment on the merits. "'It is a well-settled rule that a party opposing a summary judgment motion must inform the trial judge of the reasons, legal or factual, why summary

judgment should not be entered,' and present [his] arguments to the Court before it enters final judgment." *De v. City of Chicago*, 912 F. Supp. 2d 709, 733 (N.D. Ill. 2012) (quoting *Reklau v. Merch. Nat'l Corp.*, 808 F.2d 628, 630 n.4 (7th Cir. 1986)). Plaintiff's response to summary judgment falls far short of this standard. After spending the first ten pages of his brief arguing that his EEOC charge was timely, Plaintiff devotes less than a page and half to the substance of his ADA claim. Plaintiff fails to explain what type of ADA claim he is pursuing or to identify its elements, and ignores most of the arguments advanced by Union Pacific in support of summary judgment.

In particular, Plaintiff has not come forward with evidence that Plaintiff is or was disabled within the meaning of the ADA, which is required to succeed on a disparate treatment claim under either the direct or indirect method. See *Lloyd v. Swifty Transp., Inc.*, 552 F.3d 594, 601 (7th Cir. 2009) (outlining elements). "Merely having … a medical condition"—or being perceived as having a medical condition—"is not enough" to be "disabled within the meaning of the ADA." *Powers v. USF Holland, Inc.*, 667 F.3d 815, 819 (7th Cir. 2011). "Rather, to be disabled within the meaning of the ADA, the plaintiff must have '(A) [a] physical or mental impairment that substantially limits one or more of the major life activities of [the] individual; (B) [a] record of such an impairment; or (C) [be] regarded as having such an impairment.'" *Id.* (quoting 42 U.S.C. § 12102(2)).

In the half paragraph that Plaintiff devotes to this issue in his response brief, he identifies two ways in which he should be considered disabled. First, Plaintiff argues that he was impaired because was unable to "take care of himself financially[] during the period of time he was wrongfully held off of work because of the continued treatment that [Defendant] needlessly required him to work through." [134] at 11. But this does not demonstrate that Plaintiff was
16

unable to support himself because of his *disability*—it shows that he was unable to support himself because of Defendant's allegedly discriminatory decision not to return him to work in 2016.[1] And Plaintiff testified there was nothing in his daily life that he was prevented from doing due to his treatment for alcoholism.

Second, Plaintiff appears to be arguing that Defendant regarded him as having a disability, as evidenced by the fact that it required him to undergo additional treatment before returning to work as a Locomotive Engineer. But the perceived inability to perform a single job is insufficient to show disability under the ADA. "To be substantially limited in the major life activity of working means that a claimant is 'significantly restricted in the ability to perform either a class of jobs or a broad range of jobs in various classes as compared to the average person having comparable training, skills and abilities.'" *Powers*, 667 F.3d at 820 (quoting 29 C.F.R. § 1630.2(j)(3)(I)). "A class of jobs includes 'the number and types of jobs utilizing similar training, knowledge, skills or abilities, within [the employee's] geographical area.'" *Id*. (quoting 29 C.F.R. § 1630.2(j)(3)(ii)(B)). "A broad range of jobs includes 'the number and types of other jobs not utilizing similar training, knowledge, skills or abilities within that geographical area.'" *Id*. (quoting 29 C.F.R. § 1630.2(j)(3)(ii)(C)). Plaintiff does not acknowledge this legal standard or make any attempt to show that Defendant regarded him as being unable to perform a class of jobs or a broad range of jobs in various classes. Indeed, the only evidence in the record going to this point is Plaintiff's testimony that he was able to and did, in fact, work during his leave of absence from Defendant.

To the extent that Plaintiff is relying on the indirect method of proof originally developed in the Title VII context by *McDonnell Douglas Corp. v. Green,* 411 U.S. 792 (1973), Plaintiff also cannot establish two additional essential elements of his *prima facie* case: that he was

---

[1] Even while Plaintiff was in treatment in 2007, he was working nearly full-time at a collection agency.

meeting his employer's legitimate expectations, or that similarly situated employees without a disability were treated more favorably. See *Bunn v. Khoury Enterprises, Inc.*, 753 F.3d 676, 685 (7th Cir. 2014). The undisputed evidence shows that Plaintiff was not meeting Defendant's legitimate expectations when Defendant refused to return him to work. Plaintiff was suspended from service for an admitted Form B violation and under investigation, and he had just reported a second DUI to the company.

As to similarly situated employees, Plaintiff's only argument is that Plaintiff "testified that while he knew other engineers who had been through the [EAP], none of those engineers were required to see Dr. Henry as Mr. Smith was." [134] at 11. But Plaintiff never identifies those engineers or provides any information that would be necessary to determine if they are "directly comparable to [him] in all material respects"—such as their performance histories and any misconduct that resulted in their being placed in the EAP. *Williams v. Office of Chief Judge of Cook Cnty. Ill.*, 839 F.3d 617, 626 (7th Cir. 2016); see also *Gates v. Caterpillar, Inc.,* 513 F.3d 680, 690 (7th Cir. 2008) (explaining that typically, a plaintiff needs to show that the other employee "dealt with the same supervisor, [was] subject to the same standards, and had engaged in similar conduct without such differentiating or mitigating circumstances as would distinguish [his] conduct or the employer's treatment of [him]"); *Nichols v. S. Ill. Univ.-Edwardsville*, 510 F.3d 772, 786 (7th Cir. 2007) (requiring plaintiffs to identify an employee who had engaged in similar misconduct in order to satisfy the similarly situated requirement). For example, Plaintiff has not pointed to any similarly situated engineers who had the alcohol- or sleep-related problems that he had—both of which could impair his ability to operate a locomotive—and by extension, create a risk to public safety.

In sum, Plaintiff fails to show that he is or was disabled under the ADA, that he was meeting his employer's legitimate expectations, or that similarly situated employees without a disability were treated more favorable. Defendant is therefore entitled to summary judgment on the merits of Plaintiff's ADA claim.

**IV.  Conclusion**

For these reasons, the Court grants Defendant's motion for summary judgment [125]. This order resolves all remaining claims in the case. Judgment will be entered in favor of Defendant and against Plaintiff.

Dated: March 13, 2018

Robert M. Dow, Jr.
United States District Judge